IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ARNESHA WALKER,                          )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )        CIV. ACT. NO. 2:14cv1246-TFM
                                         )
HYUNDAI MOTOR                            )
MANUFACTURING OF                         )
ALABAMA, LLC,                            )
                                         )
          Defendant.                     )

## OPINION and ORDER

## I.  INTRODUCTION

On December 23, 2014, Plaintiff Arnesha Walker ("Plaintiff" or "Walker") filed a complaint against Defendant Hyundai Motor Manufacturing of Alabama, LLC ("Defendant" or "HMMA").  Doc. 1.  Walker asserts two claims: (1) HMMA subjected her to a hostile work environment, and (2) HMMA terminated her employment in retaliation for submitting workplace complaints that she had been subjected to sexual harassment and threats.  *Id.*  The parties do not dispute that Count One of the Complaint is due to be dismissed.  *See* Doc. 33-1, Pl's Dep., pp. 121-22; Doc. 40, Pl's Resp., p. 1. Consequently, the sole claim before the court is that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by terminating her employment in retaliation for engaging in protected conduct.  Doc. 40, Pl's Resp., p. 1.

This court has jurisdiction over the Title VII claims pursuant to 42 U.S.C. § 2000e-5.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Now pending before the court is the Motion for Summary Judgment filed by HMMA on April 28, 2016. Doc. 31. The court has carefully reviewed the Motion, the supporting and opposing briefs, and evidentiary materials and concludes that the Motion for Summary Judgment is due to be GRANTED.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute][1] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); FED.R.CIV.P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including

---

[1] Effective December 1, 2010, the language of Rule 56(a) was amended.  The word "dispute" replaced the word "issue" to "better reflect[] the focus of a summary-judgment determination."  FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments.

pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322-324.

Once the moving party meets its evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; FED.R.CIV.P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). A genuine dispute of material fact exists when the non-moving party produces evidence that would allow a reasonable fact-finder to return a verdict in his favor. *Greenberg*, 498 F.3d at 1263.

To survive a properly supported motion for summary judgment, the non-moving is required to produce "sufficient [favorable] evidence" establishing a violation of his constitutional rights. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice;

there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra*. Hence, when a party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the party will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact).

### III.  FACTS

#### A. The Discriminatory Harassment Policy

Walker was an employee of Aerotek, Inc. ("Aerotek"), a staffing agency which provides support to various companies, including HMMA. Pl's Dep., p. 21; Clevenger's Dep., pp. 129-30.  Aerotek has an office in the General Assembly Building on the premises of HMMA, as well as an office on Zelda Road in Montgomery, Alabama. Pl's Dep., pp. 24-25.  Walker's employment with Aerotek was "at-will," and HMMA used Aerotek's employees on an "as-needed basis."  Clevenger's Dep., p. 130; Pl's Dep., pp. 53-54, Exh. DX-1.  For purposes of the Motion for Summary Judgment, HMMA "will presume that it was a joint employer of Plaintiff."  Doc. 32, Def's Memorandum, p. 11.

Aerotek assigned Walker to work at HMMA on March 13, 2013. Pl's Dep., p. 17. During orientation, Kesha, an Aerotek manager, instructed Walker to report any incidences she believed to be sexual harassment to Aerotek, or if no one from Aerotek

was available, to her HMMA team leader or supervisor.  Pl's Dep., p. 50.  In addition, Aerotek provided the "Aerotek Contract Employee Handbook" to Walker, which includes a written policy on reporting harassment.  Pl's Dep., p. 89-90, Exh. DX-2. Specifically, the policy states:

> Aerotek strongly encourages the prompt reporting of all incidents of discriminatory harassment.  If you believe you are being harassed or have observed harassment, we strongly encourage you to promptly notify your recruiter, customer support representative, the director of branch operations, or the manager of administration at your local Aerotek office.

> When a report of harassment is made, Aerotek undertakes a prompt and thorough investigation as appropriate under the circumstances.  The steps taken during the investigation vary depending upon the nature of the allegations.  Confidentiality is maintained throughout the investigative process to the extent practical and consistent with Aerotek[] needs. Upon completion of the investigation, the aggrieved party and the person(s) accused are notified of the outcome and remedial action is taken, if appropriate.

> Individuals who report harassment or are involved in the investigation of a harassment complaint will not be subject to reprisal or retaliation.  Retaliation is a very serious violation of this policy and should be reported immediately.

> The managers and supervisors of Aerotek are accountable for adhering to this policy, for promptly reporting any incident of harassment, and for maintaining a positive and productive work environment.

Pl's Exh. DX-2, pp. 5-6.

**B. The First Incident**

On or around April 25, 2013, Walker reported to an HMMA supervisor, as well as Aerotek managers Triphenia Guice ("Tri") and Kesha, that she was harassed by HMMA team member Chris Wright.  Pl's Dep., pp. 57-58, 123.  Walker submitted a written statement, alleging the following:

We were getting ready to go to break it was 9 o'clock . . . I Arnesha Walker ask my team member Chris [] to call out my number while I [write] it down and he did but then he started to walk towards me and said "Your nipples are hard" I said [why] are you looking at me like that and that's when he proceeded to walk closer and grab then pinched my nipple! Nobody that I know of seen it because they were walking on break . . . When it happen I snatched away from him and said stop.  I feel very violated and uncomfortable around him.  I talked to a guy named Terrance HMMA that work around me about what happen. . . . I didn't know if I should go to the office Aerotek or tell Chris HMMA myself that I didn't like being touch[ed] like that.  I want action taken A/S/A/P I don't want to continue to work around him.  We do not have a relationship for him to do that at work. . . .  He trained me before when I first started but never has he came on to me like that I remember him asking me for my phone several times the last time was while going to lunch last night.  Come to find out when I talked to Terrance and told him all that and he stated that Christ told him he ask for another girls phone and went [through] her pictures and seen nude pics. He came to Terrance and told him what he seen. So that's why he was asking for my phone but I didn't find out till last night 4-23-13.

- No witnesses except Terrance HMMA when Chris asked for phone
- Another girl name unknown
- Unknown reason why Chris HMMA is doing this to me never led him on, he is married Chris invited me to wedding receptions.

Doc. 33-3, Ex. B.

Tri called another Aerotek manager, Lisa Kerley ("Lisa"), to discuss Walker's allegations.   Initially, Lisa indicated that Walker should return to work.   Walker, however, told Tri that she "didn't feel comfortable" returning to the line after complaining that she "had just been touched."   *Id*., p. 58.  Tri told Walker that Lisa advised that "her only other option is to go home" and that she would not be paid.  *Id*. Tri ended the telephone conversation with Lisa, told Walker that Lisa's information was incorrect, and gave her the number of Aerotek corporate headquarters. *Id*., p. 59.  Walker decided to go home.   Upon leaving HMMA, Walker called headquarters and left a

voicemail message.  A manager at the Aerotek corporate office returned Walker's call and advised her to remain home, that she would be paid until the investigation ended, and that someone from Aerotek would contact her.  *Id.*, pp. 59-60.

On April 25, 2013, Tri emailed a copy of Walker's statement regarding the incident to Lisa, and Lisa forwarded the allegations to HMMA Team Relations Member Robert Clevenger ("Clevenger").  Doc. 33-3, Ex. B.  Aerotek continued to pay Walker in the form of a debit card during the time HMMA conducted the investigation. Pl's Dep., p. 67.  On April 26, 2013, HMMA issued a Team Relations Memo from J. Marie Byrd ("Byrd"), the HMMA Team Relations Assistant Manager, to Clevenger, in which HMMA concluded that "[i]t was confirmed by Christopher's own confession, that he told her that her nipples were hard."  *Id.*, Ex. C, p. 3.  HMMA also entered a "side note" that "Shane Nice called Marie Byrd on April 26, 2013, and informed her that Aerotek moved Arnesha [Walker] to Body Shop.  They did this on their own accord and not by HMMA's recommendation.  They stated that she requested to be moved." *Id*.  On May 3, 2013, HMMA terminated Wright's employment on the grounds that Wright violated HMMA's policies on harassment and serious misconduct. Attach. to Walker's Dep., DX-8.  The same day, HMMA produced a Team Relations Memo from HMMA Team Relations Member Byrd, to Aerotek Management, in which HMMA indicated that the investigation was complete and that "appropriate action has been taken to stop/prevent the behavior that was described."  *Id.*, Ex. D.

### C. The Second Incident

On July 27, 2013, Walker complained to Tommy, an HMMA supervisor, and

Aerotek Shift Manager Misti Durham ("Misti") that she was harassed by the HMMA team leader Josh Davis. Pl's Dep., p. 64. Misti instructed Walker to go to an office in the welding department and write a statement. *Id.*, p. 65. An HMMA representative took the statement and called Misti. At that time, Misti instructed Walker to go home and that "they had to do another investigation and just wait on her phone call." *Id.*, p. 66. Aerotek continued to pay Walker during the investigation. Pl's Dep., p. 67.

On July 29, 2013, Lisa Kerley told HMMA Team Relations Assistant Manager Barry Jackson that "Walker had been sent home by Aerotek pending an investigation of a complaint of sexual harassment that Walker made against HMMA employee Josh Davis." Doc. 33-4, Def's Ex. 4, Jackson's Dec., p. 2. Jackson asked when Walker would return to work and Kerley advised him that "she would look into it." *Id.*

On August 5, 2013, HMMA produced a Team Relations Memo from Jackson to Clevenger summarizing the investigation. Doc. 33-3, Attach. to Clevenger's Dec., Def's Ex. E. Specifically, HMMA found that Walker's allegations that Josh invited Walker to watch a boxing match, that he said she had a "little booty," that he used profanity toward her on several occasions, and that he would "curse her" in front of other people were "substantiated". *Id.*, p. 3.

On the same day, Jackson spoke with Aerotek Manager Eric Booker ("Booker") about the status of Walker's return. Doc. 33-4, Jackson's Dec., Def's Ex. 4. Jackson's recollection is that Booker told him that "he had spoken with Walker on the phone, and further stated that Walker informed [him] during their conversation that she was not going to return to work at HMMA." *Id.*

On August 12, 2013, HMMA concluded that Davis "made inappropriate comments regarding a female contractor, as well as us[ed] inappropriate language while engaging in conversations with her . . . in violation of HMMA's Harassment and Conduct Policies" and placed him in "Phase II of Corrective Action."  Attach. to Pl's Dep., DX-9. On August 19, 2013, HMMA Team Relations Assistant Manager sent a letter to Lisa Kerley, the On-Premise Manager at Aerotek, reporting that the "investigation has been completed regarding the complaint and the appropriate actions have been taken."  *Id*.

Lisa Kerley called Walker about returning to work in the General Assembly area. Walker told her that she "didn't want to come back" because she did not feel comfortable working around Josh. Pl's Dep., pp. 86-88.  After Kerley explained that she would be assigned a job on the other side of the building, Walker agreed to return to work. *Id*., p. 88.

### D. The Third Incident

Walker returned to work on September 23, 2013.  Aerotek assigned Walker to work in the Paint Department at HMMA.  Pl's Dep., pp. 160-161.  During the evening shift, Walker reported to Aerotek Shift Manager Misti, that she saw Davis stare at her in the cafeteria.  Pl's Dep., pp. 68, 71, 155-56, 161. Misti told Walker to go home.  *Id*., pp. 56, 71.  Aerotek continued to compensate Walker during the time she was away from work.  *Id*., p. 74.

On October 7, 2013, Misti Durham sent the following email to HMMA:

Dear HMMA TMR,

I was instructed to inform you of another complaint by Aerotek employee Arnesha Walker.

Arnesha was brought back to work on 9/23/13 at HMMA in the Paint Department (A Shift Production – Alex Andrew's Crew); this was her 1st and only day back since the last complaint she made.

She called in absent 9/24/13 and informed myself and my partner, Erik Booker, that she does not feel comfortable working in her area (PAINT) on (A shift rotation) because she still sees Josh when she comes in and out of the gate and she sees him in the cafeteria during lunch. She mentioned Josh was staring at her.

Since then, she informed our Regional Employee Relations Manager that Josh was staring at her aggressively the night of 9/23/13 and that Jay – (she was not sure of the name) the employee in Paint Shop that was training on Paint Production Process was witness to this situation. Our Employee Relations Manager is requesting that we get a statement from the TM that trained Arnesha the one night that she was in Paint 9/23/13.

I was instructed to ask[] you guys to obtain a statement from HMMA TM that [was] training Arnesha 9/24/13 as to whether or not he was witness to such behavior. . . .

Doc. 33-3, Def's Ex. G.  HMMA conducted an investigation.

On October 10, 2013, an HMMA Team Relations Memo from Shymill Ivy to

Barry Jackson and Marie Byrd summarized the investigation as follows:

<u>Summary</u>:

On July 27, 2013, Aerotek TM Arnesha Walker alleged inappropriate behavior and possible sexual harassment against Weld TL Josh Davis.  Since then, an investigation has been completed and appropriate actions have been taken.

On Tuesday, October 8, 2013, Aerotek Management informed me that Arnesha was brought back to work in Paint Shop on 9/23/13 (her first day back since the previous incident with Josh) and made allegations that when she went to lunch Josh was staring at her aggressively in the Admin Cafeteria and made her feel uncomfortable.

On Wednesday, October 9, 2013, TR Rep Mike Finney and I sat down with Weld TL Josh Davis and he explained to us that he had not seen Aerotek TM Arnesha Walker since August 10, 2013 in the Weld Shop.

In Arnesha's complaint to Aerotek Management she stated that an HMMA TM named "Jay" trained her when she returned to Paint Shop on 9/23/13 and he witnessed the alleged inappropriate behavior/harassment (staring at her aggressively) from TL Josh Davis.  After investigating the incident, it was concluded that "Jay" was not an HMMA TM but an Aerotek TM by the name of Jesse Johnson.

On Wednesday, October 9, 2013, Aerotek Manager Misty Durham spoke with Jesse regarding the incident that allegedly took place between Josh and Arnesha.  Jesse stated that he recall[s] Arnesha (not by name) working with him for only one night upstairs (Tac-off booth in Top Coat). Jesse stated that when they went to break, they were outside sitting at the tables in front of Paint Shop (the smoking tables) when there was a guy walking from Weld Shop to the cafeteria and she asked him did he know him.  Jesse stated that the guy was so far away he could not see him and he was sure the guy couldn't see them.  Therefore, he replied "no".  Jesse stated that the guy was so far away that you would have to actually know him to know who he was.  Jesse stated that he did not see the guy look at Arnesha nor did he see them converse.

**Conclusion**

- Jesse confirmed that Josh did not stare at Arnesha aggressively nor did he converse with her during their break on 9/23/13.

Doc. 33-3, Def's Ex. H.    HMMA did not discipline Davis.  Clevenger's Dep., pp. 121-122.

### E. The Fourth Incident

On or around October 14, 2013, Walker returned to work in General Assembly. After working a couple of hours, Walker went to the restroom. As she walked out of the bathroom, an unknown man "randomly came up to [her] and he . . . called [her] a bitch and he said, 'You got my cousin fired.'" Pl's Dep., p. 75.   He also threatened to kill her.

*Id*., p. 78. Walker ran to the line and told the HMMA team leader about the incident.  Pl's Dep., pp. 76, 79.  She then went to the Aerotek office and told Misti that she could not return to General Assembly because she was "still kind of . . . shooken (sic) up."  *Id*. Misti told Walker that "we're going to send you home and . . . they [were] going to try to get the cameras and . . . figure out who exactly was that guy." *Id*.  Afterward, Misti called Walker and told her that HMMA was unable to determine who threatened her because the cameras were not directed on the bathroom area. *Id*., p. 80.   Aerotek continued to compensate Walker for the days she missed work. *Id*., p. 67.

On October 14, 2013, HMMA issued a Team Relations Memo from HMMA Team Relations Representative Sheila King to Jackson and Byrd which summarized the incident as follows:

> On October 14, 2013, Aerotek Representative Eric Booker notified Team Relation Representative Sheila King that employee Arnesha Walker is alleging that [an] unknown HMMA Team Member had threatened to kill her.  Eric Booker took the following statement from Arnesha.

> I was walking to the bathroom before I could walk in a guy with a burgundy collard [sic] shirt (Hyundai) with a green back pack stated "bitch you got my cousin fired".  I asked who was his cousin and he stated "bitch I will kill you".  I then ran into the bathroom and stayed in there.  After using the bathroom and thinking to myself I do not have a cell phone I came out. I tried to use the break area phone but I did not know that there is an extension number to put in.  The guy is caramel complexion with low haircut.  I came back to the line and told Jimmy (Team Leader) that I had an emergency and then I came to Aerotek office.

> Eric asked what time did this occur and she replied approximately 11:15 p.m.  Eric asked were there any witnesses and she replied no.

> Team Relations Representatives Tian Ingram and Sheila King walked the floor but did not see anyone that fit the description.

Conclusion:

- At this time we do not know who the Team Member is to take his statement.
- TR asked around to see if we could find out who the TM was.
- TR checked the terminated TMs file to see if he had any relatives listed.
- TR was informed by Aerotek that Arnesha stated she was not returning to work.

Doc. 33-3, Def's Ex. I.

On October 15, 2013, HMMA Team Relations Assistant Manager Barry Jackson sent an email to several other Team Relations members, stating the following:

Let's make sure Aerotek follows back up with her tonight and let her know that if she sees the guy anymore to let us know immediately.

Also that if she feels threatened she may want to contact the local authorities.

After Booker delivers this message we need to add it to the report and close it out.

We also need to look at asking around to see if we can possibly find out if Lewis Marshall has a cousin that works here.

Def's Ex. J.

Later that day, HMMA Team Relations Specialist Sheila King responded to Barry Jackson's email, stating "I talked with Erick Booker tonight and Arnesha Walker called and said she was not coming back to work." *Id.* An HMMA Team Relations Weekly report generated on October 19, 2013, also indicates that "Aerotek employee Arnesha called in [on or around October 15, 2013] and told Erick Booker that she was not coming back to work." Def's Ex. K. HMMA closed the investigation. *Id.*

**F. The Final Decision**

On October 30, 2013, Aerotek Manager Kerley mentioned to HMMA Team Relations Specialist Ivy that Walker would be returning to work. That same day, HMMA Team Relations Specialist Shymill Ivy sent an email to other Team Relations members regarding the "Lisa Kerley Conversation," stating as follows:

> . . . She stated that Aerotek TM Arnesha Walker would be returning on tomorrow (10/31/13). Lisa stated that Aerotek Legal and HMMA legal had discussed this and due to possible retaliation claims, she would be returning. I thought this was rather strange knowing everything surrounding this TM and the fact that I had personally just conducted an investigation concerning her and Weld TM Josh Davis with no findings of wrong doing so I contacted AM Barry Jackson to inform him of what was just told to me and to ask him why he didn't give me a courtesy email. When I told Barry about it he was shocked and stated that he knew nothing about this but was about to have a 3:30 meeting with Corporate Attorney Chris Whitehead and would bring this to his attention immediately.

Def's Ex. L.

The following morning, HMMA Team Relations Assistant Manager Jennifer Byrd replied to Ivy's email, stating "We are all shocked by this. She quit Aerotek twice. We would not allow this with our TMs, period. When Barry told me this, I thought he was kidding. Our team was completely unaware." *Id*.

On or around November 1, 2013, Misti called Walker and told her that there were no other available departments at HMMA and asked if she would be willing to work for Sejong in Fort Deposit, Alabama. *Id*., pp. 81-82. Walker indicated that she would be unable to do so because the location was too far from her residence. *Id*. Walker suggested other departments at HMMA where she believed she could work, such as the Engine Department. *Id*., p. 82. Misti told her that they would find another spot for her at HMMA and to meet her at the Aerotek office at 2:30 p.m. *Id*., p. 83. HMMA Team

Relations Assistant Manager Barry Jackson called Kerley and advised that "[d]ue to HMMA's essential job requirement of prompt, regular, predictable attendance, . . . HMMA did not wish for [Walker] to be assigned to work at HMMA's facility any longer due to Walker's poor attendance record."  Doc. 33-4, Jackson's Dec., p. 2.  One hour before the meeting, Misti called Walker and told her that HMMA would not allow her to return. Pl's Dep., p. 83.   Aerotek subsequently "separated" Walker from employment with its company.  Pl's Dep., p. 138.

## IV.  Discussion

Walker asserts that HMMA refused to reassign her to a job in retaliation for reporting violations of the anti-harassment policy against its employees.

In *Vickers v. Hyundai Motor Manufacturing of Alabama*, No. 2:14cv126-WKW (M.D. Ala., Sept. 30, 2015) (unpublished), this court summarized the general law on retaliation.

> "Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of* Regents, 212 F.3d 571, 586 (11th Cir.2000). Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.
>
> > It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
>
> 42 U.S.C. § 2000e−3(a). Congress thus recognized two predicates for retaliation claims: one for opposition to discriminatory practices, and another for participation in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." ... And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000) (citations omitted).

Proving that an employer retaliated against an employee is rarely a straightforward undertaking. Stated differently, a plaintiff's case generally rests entirely on circumstantial evidence, because direct evidence of an employer's intent or motivation often is either unavailable or difficult to acquire. *See Sheridan v. E.I. DuPont De Nemours & Co.,* 100 F.3d 1061, 1071 (3rd Cir.1996) (*en banc* ). Such is the case here as the parties rely only on circumstantial evidence. Federal courts typically evaluate the sufficiency of circumstantial evidence using some variant of the well-known framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). *See also St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993). As Justice O'Connor observed in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), "the entire purpose of the *McDonnell Douglas prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." 490 U.S. at 271 (O'Connor, J., concurring).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to show, through admissible evidence, a legitimate, non-retaliatory reason for the adverse employment action. *Burdine,* 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [retaliatory] animus," *id*. at 257, the presumption of retaliation created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id*. at 255 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for

retaliation. *Combs,* 106 F.3d at 1528 (citing *Burdine,* 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at 804).

The Supreme Court recently clarified a plaintiff's burden and held that, as to the causation standard for a retaliation claim, a plaintiff must "show that the [adverse employment action] would not have occurred in the absence of – that is, but-for – the defendant's conduct." *University of Texas Southwestern Med. v. Nassar,* 570 U.S. __, 133 S.Ct. 2517, 2525 (2013).[7] In other words, a plaintiff has to "establish that his or her protected activity was a but-for cause [and not just a motivating factor] of the alleged adverse employment action by the employer." *Nassar,* 133 S.Ct. at 2534.

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir.2008) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001)).

2015 WL 5736909, at *7-8.

HMMA argues that Walker's complaint that Davis stared at her is not protected conduct because a stare by itself is not a discriminatory, harassing, or retaliatory action and Hyundai did not approve of such conduct. HMMA also argues that Walker's report that an unidentified HMMA employee threatened her is not protected conduct because the employee's actions were not authorized by Hyundai and "it is clear that he was motivated by his belief that Plaintiff had cost a family member his job, and not by Plaintiff's sex – or her race, religion, or any other protected status for that matter." Doc. 32, Def's Resp., p. 17. There is no argument, however, that the submission of her remaining harassment claims are considered protected activity under Title VII. The court questions whether there is a causal connection between the harassment allegations and any adverse employment action on the part of HMMA. It is strongly arguable that

HMMA was not Walker's "employer" and that it did not at any time instruct her to leave work or otherwise excuse her absences. Nonetheless, for purposes of the Motion for Summary Judgment, HMMA presumes it is Walker's "joint employer". Doc. 32, Def's Memorandum, p. 11.

Even assuming the elements of a prima facie case are met, the court concludes that Walker fails to rebut the nondiscriminatory reasons given by HMMA for ending Walker's temporary employment at its facility, *i.e.* her frequent absences and its impression that she quit her job on at least two occasions.  *See Pennington,* 261 F.3d at 1268 (assuming without deciding a *prima facie* case is met in order to proceed to the salient issues of a pretext analysis); *Rawls v. Alabama Dep't of Human Resources,* 507 Fed. Appx. 895, 898, 2013 WL 500456, at *3 (11th Cir. Feb. 11, 2013) (affirming district court that moved ahead to pretext and assumed a *prima facie* case); *Long v. Alabama Dept. of Human Resources,* 2014 WL 8843764, at *27 (M.D.Ala. Nov. 10, 2014), *adopted in relevant part by Long v. Alabama Dept. of Human Resources,* 2015 WL 2345240 (M.D.Ala. Jan. 30, 2015) (declining to undergo a *prima facie* analysis so as to examine evidence of pretext as to a retaliation claim); *Shuford v. Alabama State Bd. of Educ.,* 978 F.Supp. 1008, 1017 (M.D.Ala.1997) (Where the "court has sufficient evidence to determine whether the employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden shifting process and should instead reach the ultimate issue of discrimination.").

HMMA articulates a non-retaliatory reason for its action.  HMMA claims that it refused to allow Aerotek assign Walker to another position due to her attendance record

and its understanding that she refused to return to work on at least two occasions. Absenteeism is a legitimate non-discriminatory reason for terminating employment. *See*, *e.g*., *Gaddis v. Russell Corp*., 242 F. Supp. 2d 1123, 1148 (M.D. Ala. 2003); *Fantroy v. Publix Super Markets, Inc.*, No. 8:12cv1940-T-33EAJ, 2013 WL 6768369, *9 (M.D. Fla., Dec. 19, 2013); *Lewis v. K2 Indus. Services, Inc*., No. 06cv0497-WKW, 2007 WL 3442189, *11 (M.D. Ala., Nov. 14, 2007). Thus, HMMA satisfies its "exceedingly light" burden to proffer a legitimate, non-discriminatory reason for its action. *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).

To establish pretext, Walker must show that HMMA's "proffered reason is not the true reason for the employment decision." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Walker argues that HMMA's reason is pretext because (1) HMMA did not express that her absenteeism was a problem at any time during her employment, (2) an email indicates HMMA's legal counsel had concerns that preventing her from working at HMMA could result in "possible retaliation claims," and (3) HMMA's corporate representative indicated that he did not "have any information from any source that Aerotek ever informed Hyundai that Ms. Walker stated she would no longer return to work and refused to return to work in August." Doc. 40, Pl's Reply, pp. 22-23.

The problem with Walker's argument is that the record indicates that Aerotek repeatedly represented to HMMA representatives that Walker declined to return to work. For example, the evidence indicates that, on August 5, 2013, Aerotek Manager Eric Booker told HMMA Assistant Manager Barry Jackson that Plaintiff told him that she

would not return to work.  See Doc. 33-4, Jackson's Dec., Def's Ex. 4.   In addition, an October 7, 2013, email from Aerotek Manager Durham to HMMA representatives indicates Walker did not wish to work in the paint area because of its proximity to one of her accused harassers. Clevenger's Dep., pp. 32-34, 36, 96, Exh. PX-14; Pl's Ex. DX-10. On October 15, 2013, HMMA Team Relations Specialist King sent an email to HMMA Team Relations Manager Jackson indicating that Aerotek Manager Booker told her that that Walker said that she was not returning to work.  Clevenger's Dec., Exhs. J & K.

Walker's reliance on the corporate representative's acknowledgement in a deposition that HMMA did not receive information from anyone from Aerotek about a refusal to return to work in August is likewise unavailing.  Shortly after the deposition, HMMA Team Relations Manager Clevenger provided a transcript errata sheet with the October 2013 emails between HMMA team relations members indicating that is was their impression from conversations with Aerotek representatives that Walker did not intend to return to work and that she had quit on two prior occasions.  Doc. 45-1, Def's Ex. A.

Walker, however, alleges that she never told anyone at Aerotek or HMMA that she did not want to work.  "The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue." *Dawson v. Henry County Police Dep't*, 238 Fed. Appx. 545, 549 (11th Cir. 2007); *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (determining that a mistake in fact does not demonstrate pretext); *DeLeon v. ST Mobile Aerospace Engineering, Inc.*, 684 F. Supp.2d 1301 (S.D. Ala. 2010).  Furthermore, it is not Plaintiff's subjective opinion that

guides the analysis. *See, e.g., Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1448–49 (11th Cir.1998) (holding that courts are not bound to a "subjective standard" when determining whether an employment decision is adverse and that an "objective" standard is appropriate). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir.2004) (citations omitted).  There is no evidence that any HMMA decisionmaker and/or any HMMA Team Relations member who objected to Walker's return had any knowledge of the specific reasons for Walker's prolonged absences from work, with the exception of one brief investigatory period.  In addition, all of the facts indicate that HMMA Team Relations Members were under the impression that she quit on at least two prior occasions.  There is also no evidence that any HMMA manager instructed Walker to leave work during the investigatory periods or at any other time.

With one exception, there are no evidentiary materials indicating that any HMMA employee knew of the reason for Walker's prolonged absences.  The record does clearly indicate that HMMA Assistant Manager Jackson knew that Walker missed work from July 27, 2013 through the close of the investigation on or around August 19, 2013; however, there is nothing indicating the reason for her missing work from the time the investigation closed on August 19, 2013, until her return to work on September 23, 2013.  HMMA was also not informed by either Walker or Aerotek of the reasons for her other absences.

If anything, the evidentiary materials demonstrate that HMMA was under the impression that Walker's prolonged absences were due to her decision not to return to work. With the exception of the absences during HMMA's investigation of Davis, there are no records indicating HMMA had any knowledge that Walker was instructed by Aerotek not to return to work. In addition, the evidentiary materials indicate that HMMA was repeatedly informed by Aerotek that Walker told them that she would not return to HMMA and that HMMA relied on these representations. Doc. 33-3, Def's Ex. I, K & L; Doc. 33-4, Def's Ex. 4.

> The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. [Courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999).

> Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "Title VII addresses discrimination." *Ferguson v. Veterans Administration*, [723 F.2d 871, 872 (11th Cir.1984) ]. "Title VII is not a shield against harsh treatment at the workplace." *Jackson v. City of Kileen*, [654 F.2d 1181, 1186 (5th Cir.1981) ]. Nor does the statute require the employer to have good cause for its decisions.... "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination [or retaliation]. The employer's stated legitimate reason ... does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, [600 F.2d 1003, 1012 n. 6 (1st Cir.1979)].

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir.1984).

*Vickers v. Hyundai Motor Mfg. of Alabama, LLC*, No. 2:14-CV-126-WKW (WO), 2015 WL 5736909, at *7–9 (M.D. Ala. Sept. 30, 2015), *aff'd sub nom. Vickers v. Hyundai Motor Mfg. Alabama, LLC*, No. 15-14905, 2016 WL 1459112 (11th Cir. Apr. 14, 2016).

This court therefore concludes that Walker fails to demonstrate a genuine dispute from which a reasonable factfinder could find that HMMA's reason for disallowing Walker's return to work at its facility is unworthy of credence. Accordingly, HMMA's Motion for Summary Judgment as to Plaintiff's Title VII retaliation claim is due to be GRANTED.

## V.  CONCLUSION

It is

ORDERED that the Motion for Summary Judgment be and is hereby GRANTED in favor of Defendant. Doc. 31. A separate judgment shall issue.

Done this 28th day of September, 2016.

_____/s/Terry F. Moorer_____
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE